Can I ask, before your time begins, are you all dividing time? Yes, we are, Your Honor. How are you going to do that? We'll aim for five minutes each in our initial remarks, and we'll try to keep track of our time. By subject matter? Yes. Yes, okay. Yes, so my colleague, Ms. Williams, will be handling the improper cross-examination and sentencing issues. Those are issues three through five, and I'll be addressing the juror bias and improper expert testimony issues. Very good. Okay. Thank you. Begin whenever you're ready. Good morning, Your Honors. May it please the Court. Anya Goldstein here with my colleague, Jennifer Williams, on behalf of defendant-appellant Koren Kechedzian. I will be limiting my argument to Mr. Kechedzian's first issue, the juror bias issue, and within that, the actual bias question, unless the Court has other questions on either implied juror bias or on the improper expert testimony issue. So the actual bias inquiry looks to the challenged juror's questions during voir dire, and if the juror expresses bias, whether they later commit to lay aside that bias and act fairly. Now, here, just as in the Gonzalez case, juror number three was pressed several times on the issue of whether she'd be able to lay aside her prior experiences, and she was never able to say that she could set aside those experiences. She said she'd try, she might be able to, she'd want to, but didn't know if she could. So we have this additional thing that Gonzalez didn't have, though, of this promise to say something later. So this seems novel. Is there any case anywhere in any circuit that discusses this kind of future promise by a juror? Not that I'm aware of, Your Honor. And I think there are two things that are different in this case. One is what you just raised, and the other is the later question that the government raised, where juror number three didn't raise her hand in answer to the question whether she had any trouble with the burden of proof. But even though there's not a case directly on point where there's this future promise, I think Gonzalez does give us guidance on this issue, because in that case the court stated that when a juror is unable, despite repeated questioning, to assure a court that she can be impartial, then the court can have no comfort that she's able to be. It's just that then we have this extra thing, though. So, I mean, you're right, I think, if you stop the clock, but then after that she says, but I'll tell you if I have problems, essentially, and then she never does. So why is that not something that changes the picture? So that does not change the analysis, because essentially a juror has been seated who has not said she's been impartial. Now, the court is abdicating its gatekeeping role there and just saying later, you please come to me and let me know if your bias is affecting your deliberations. Now, the problem with that is, as Your Honor pointed out, juror number three never comes forward. We don't know why she never comes forward. It may be that she stopped caring. It may be that she became invested in the trial and didn't want to be kicked off the jury. It could be that her bias kicked in. She decided she wanted to put Mr. Caccuzzi in a way. We don't know. So that's the issue with kind of shifting it to the juror to make that determination herself at a later point in time. It's kind of always on the juror, though, right? I mean, these questions always go to the juror confessing whether they're biased or not. So it just shifts the time of it. Well, Your Honor, I disagree, because the difference here is that this juror was honest in stating that she wasn't sure she'd be able to lay aside these previous experiences. So we're coming from a point, there would be no issue if she said, you know, I can lay this aside, and the court came back and said, okay, well, if you later have any concern about that, please come back to me. Because then you're starting from a point of a juror's self-reflection, which we do rely on. And that juror would have said she'd be able to lay aside these biases. But here we have a juror who, in her own self-reflection, has been told she's not sure she can do it. And the judge essentially tells her, you know, that's fine. Well, not really. I mean, the judge says, tell us if it turns out you can. She says, I'll try. And then the judge says, okay, well, if it turns out your trying doesn't work, then tell us. I mean, maybe that is a way to make sure that it's the same thing as the juror saying, I think I can. I mean, I think the practicalities of this situation here, a juror having to come forward on her own instead of being questioned by the court at a later time, I think that makes it less likely she'll come forward. I also think it may be pertinent. I didn't emphasize this in the brief because I didn't anticipate that concern. But the way the judge described the concern to the juror was if you're going to decide this case based on what happened to you. And that is not really the question. It's, you know, it's whether it's part of what's coming in there in the mix. So if we're now relying on the juror's legal assessment later of whether she's impartial or not, as opposed to these statements fleshed out in open court where, you know, the defense counsel can decide whether to exercise a peremptory, the judge can grant the motion to strike for cause. You don't have that here. I see I'm already over the time I was trying to take, so I'll let my colleague take over. Be sure to give you time for a bow. Thank you. Jennifer Williams, also for Mr. Kachetzian. May it please the court, I will first address the error in the prosecution's cross-examination of Mr. Kachetzian, specifically focusing on the Doyle error, and then I will quickly turn to the sentencing issues. Mr. Kachetzian testified in his own defense at trial, and he offered an exculpatory explanation as to his possession of the access devices. The government then sought to impeach this testimony by pointing out that Mr. Kachetzian had not told the version of his story at any time prior to trial. If we agree with you as an error, why was it not harmless? First of all, I'll note that it's the government's burden to show that it's not harmless beyond a reasonable doubt because it's a constitutional error. And I will also point to the numerous questions that were asked by the prosecutor. I believe there were a total of six and four different chunks in the brief. But some of them were, I mean, there's some that were not OK, maybe, and some that were OK. He did make statements before the Miranda warning also that were inconsistent, and those questions are OK. So if we assume the government could have talked about that properly but just couldn't talk about the other, it seems like this point could have been made. It also really wasn't emphasized in closing. I'm just not sure I see why the improper questions became such a huge issue at this trial that it was harmful. Well, I think the court is right that the government also asked permissibly about his statements at the time of the search and comparing those. But the government asked six questions specifically about his failure to come forward at any time prior to trial, even in the years-long investigation that this case had. So that was clearly implicating the time after Miranda. And although the government did not emphasize this in closing, the government did bring it up in other areas, specifically in talking about the production of the videotape corroborating his exculpatory story to the government. And the government, again, stated that Mr. Kojedsian failed to produce that to the government, again, injecting an admissible hearsay at that point, but failing to produce it until a year after the incident. So even though in the line of questioning, I would submit that it was extensive, with six separate questions focusing on his failure to come forward at any time prior to trial to tell law enforcement this story, the government took advantage of other opportunities to focus on the fact that he didn't come forward. And in doing so, the government implied — I'm confused a little bit. So the video point isn't part of the problem of asking the questions about why he didn't tell this story. That's a separate issue, isn't it? It is a separate issue. But in the reply, in the footnote, I said this is also part of the Doyle error because the government is basically saying, hey, the evidence that supports your story, you never brought that forward to us. Why isn't this a prior and consistent statement? Because what the government was doing was not comparing stories. There was no prior and consistent statement after he received Miranda warnings through trial. There was only silence. There was one statement — Yes, but you want to use Doyle to make this a Doyle violation. The government argues, well, we don't need to get the Doyle. This is merely a prior and consistent statement. But the government wholly ignores the six questions that it asked Mr. Kuczynski about his failure to come forward at any time prior to trial. And those are the only questions that are before the court. The government wants to point to the questions. But given that there was the prior and consistent statement and he hadn't come forward with the video, I mean, I almost think that hurts you on the harmlessness. So he never came forward with the video. He has the prior and consistent statements. So I just am not sure why the jury is going to be persuaded by these silence questions when there are these big problems with his story otherwise. Well, not coming forward with the video is part of the silence issue because the government is basically implying that the defendant had a duty to come forward and produce to the government the video evidence. He could have waited, as he properly did, until producing it closer to trial. But was the question, why didn't you give us the video? Or the question is, why didn't you tell the story? Those seem different to me. Well, they're related because the government's saying, you never told the story and you never gave us the evidence about your story. So it's basically. So you never gave us the video, a Doyle error? I believe that it supports the harmfulness of the Doyle error because the government is saying you never told us the story. And also, you never came forward and provided the video that supports your story, implying that he had a duty to come forward and provide the video. Also, that he had a duty to come forward and provide this story to the government. And he didn't. Doyle teaches that it is fundamentally unfair to tell a defendant that he has the right to remain silent, therefore implicitly assuring him that he won't be penalized for his silence. And then to question him at trial why it was that he was silent and invite the jury to find that his story is now fabricated because he didn't come forward with a story or with evidence supporting the story. Can you remind us what was the note that the jury sent that might be relevant to this? Yes. Yes. Thank you, Your Honor. The jury was also hung up on the intent issue. The jury sent a note asking what specifically the evidence was that they could consider in trying to decide whether Mr. Kajetsian had the intent. And here, as cases have found, when credibility is the main point, there was no issue. There was no dispute as to whether he possessed the devices. The only dispute was why he possessed the devices. And it hinged on whether or not the jury believed him. And here, particularly when compounded with all of the errors that the government made in injecting an admissible hearsay to destroy his credibility inappropriately, coupled with the Doyle error, I don't believe that the court can find beyond a reasonable doubt that it was harmless. I'll save time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Scott Patey for the United States. I'd like to address first the conviction issues, then if there's any time left over for sentencing. I know we didn't get to that previously, but I'll start with the conviction. As far as juror bias goes, Your Honors, there was no actual or implied bias here, and the district court did not err in seating juror number three. The defendant did not meet its burden, as it has the burden of proving bias here. It did not meet its burden, and that conclusion is supported both by this circuit's precedent as well as by common sense. I think it's fair to say, unfortunately, in this day and age, that identity theft, being a victim of identity theft, is not out of the ordinary. Well, it might not be uncommon, but it could still be traumatic. Yes, Your Honor, it can, and in this situation, I think what we have to look for is what the district court did in response to that, and the district court took its responsibility seriously as the gatekeeper. But the district court asked, could you put it aside, and she never says, I can. So how do we know it's not so traumatic that she can't? Well, we know by the district court's colloquy that it went on, by the follow-up that it did, and basically the follow-up it did with one of the other jurors who mentioned that she had had a prior instance of identity theft. The district court went into a fulsome explanation of the fairness and impartiality, and that you're not to basically, your evaluation of this case is not to be predicated on what may have happened to you. The district court entered into that and then followed up regarding, for the bias issue here, followed up and said until it got, on these equivocal statements, until it got an affirmative, and it got an affirmative yes, I would, and that affirmative. Well, where was the affirmative yes, I would from this juror? It was yes, I would in response to the district court's request that at any point in the proceedings, you find, after the district court had instructed the juror, you're not to allow your prior. So do you have any case, I'm going to ask you the same question I asked your opponent, do you have any case that says that a court can make this sort of ongoing deal as a way to weed out bias? There's no court that addresses that that I'm aware of, Your Honor, that specific factual circumstance, but the case law in the circuit is clear, and this is cases like Alexander, cases like Martinez-Martinez, where the district court is in a unique position to ascertain juror credibility and juror demeanor in a very fast-moving, fact-intensive inquiry. So, okay, we defer to the assessment of demeanor, but it's not always enough, right? Or we wouldn't have Gonzales. Correct, and I would say the difference in a case like Gonzales is that was a very factual, specific case in a cocaine case where a marriage really had fallen apart because of the cocaine use. The juror in that case had exhibited negative body language regarding ability to apply presumptions, like the district court in this case instructed on presumptions of innocence, burden of proof, and that we just don't have here. It's categorically different. You know what's different about this case? I mean, you can see that the district court, after the series of questions to which she hadn't answered affirmatively, and she could put it aside, sort of kept her around, kept her around in an array, and then subsequent to that, you know, he didn't know, the district court didn't know whether defense counsel was going to make a challenge for cause. Subsequent to that, the challenge for cause comes. So you have the record. I mean, you still have you'll tell us later, which is sort of just an admonition to the juror. If you remain, if you get selected, will you tell us later? But don't we have to evaluate the challenge based on what she said and didn't say? Well, we do, Your Honor, and I think, again, that affirmative statement that she would, that she understood what the district court was asking her to do, I think that's part of the evaluation. I also think it's. She hadn't answered the question affirmatively as of that point when the challenge was made. Well, taken in context here, what the district court had done was apprised the veneer on fairness and impartiality and understood its responsibility to drill down on equivocation. And it did. It asked a series of questions over a couple of pages to this juror about her equivocation. It resulted in an odd framing. I mean, it's an odd framing. And to Your Honor's point, I have not seen this before, but I think in context of a district court that understood its responsibility as a gatekeeper, that that is permissible here and it's not an abuse of discretion. I think if I understand Judge Fischer's question, he's saying, let's cut this off before the promise to say something later. Do you think we could affirm without the I'll tell you later part under Gonzales? In being consistent with Gonzales, we could just affirm if it had ended with her equivocal statements? Possibly under, like, just the juror Kenney analysis. The juror Kenney analysis in the Alexander case where Kenney never stated, yes, I would, or gave any kind of an affirmation. Juror Kenney merely said, I believe. I believe I can do that. And I think here, to pointedly answer Your Honor's question, we probably could. I think we could get to that. But doesn't Gonzales say, I believe is different from I'll try, essentially, or something like I'll try, which is what we have here? It may be. Again, I think here, looking at the semantic differences, it is different. Correct. But I don't think that in light of the district court's colloquy here, explanation of, understanding of an explanation of fairness and impartiality and follow-up. What did the judge say in the explanation later about, like, burden of proof that really spoke to putting aside all outside information that you might have with your own experience? Well, I think it's implicit in the nature of burden of proof and presumption, the implicit of fairness. What did the judge say that would explain that to a juror who's not a lawyer who doesn't really know what those terms mean? I mean, I'm not sure the colloquy that you're relying on is so helpful in this regard. I mean, I think it is implicit in the nature of those two legal principles of burden of proof and presumption of innocence that this defendant who's in front of you here is presumed innocent and is, you know, you're not to place any. And I think, again, it's implicit, Your Honor. It's not explicit. I think you have to look to the animating principles behind those doctrines, and that is it goes back to what the first thing the judge said. You're to judge this case based on the evidence that's presented to you in court and not on your preconceived, not on your past experiences, not on any preconceived notion you have. I think it's implicit in those. It's not explicit, but I think it is implicit. With that, I'd like to move to the issue, to the Doyle issue, which the court was inquiring on. Here, the government, I think it's correct, the government does not believe that a Doyle error occurred here. I don't think we get to Doyle. This is properly considered a case or a prosecutor probing inconsistencies in the defendant's statement. This was not a defendant who had – Lay out for me because I'm hazy on the details now. What were the prior inconsistent statements you're relying on? So this was a defendant who spoke. This was not a defendant who invoked, remained silent. This was not a defendant who spoke every time he encountered law enforcement. So inconsistencies here, when he mentioned at the time of the search, he said, I don't know anything about the cards in the trash or in my house. Now, the elephant in the room for all of this is this bag of fraud theory. It's his entire defense. And cases like Ramirez-Estrada state that you can impeach on a fact, on an omission of a fact, when you would assume that fact would be asserted. Here, the fact, the inconsistency is, well, it doesn't make any sense that you would say you don't know anything about it. Back to this, what's the statement you kind of were – Yes, the statement there is that he had no knowledge of cards, counterfeit cards in his trash or in his house. That was a statement that he made to the agents at the time of the search. Now, this is – That's inconsistent with the idea that someone gave him a bag of cards and he knew that. Absolutely. Yes, Your Honor. And that is directly inconsistent with his statement at trial, which said, oh, all of this fraudulent stuff, I meant to cut it up. I had – in the context of his, frankly, preposterous story, I had over a couple hours, I meant to cut all this stuff up, but I spread it all over my house instead. So it is directly inconsistent with that – the statement, I don't know anything about that. With his statement at trial, oh, yeah, a known fraudster gave me that. But you can't – the prosecution then can't ask the – over the years of this investigation. That's not a proper question when there's years of post-Miranda silence, right? Here, Your Honors, I think that – to answer your question, Judge Wofford, I think that it – here, context is important, and that's what Anderson v. Charles in Supreme Court and that's what McAloota tell us from this circuit, is that we look to the scope of the prosecutor's questions to determine whether it's an impermissible comment on post-Miranda silence or whether it's, in fact, probing inconsistent statements. And here, the context, which is very important, is this – the challenged – all of the challenged questions take place in a 30-page subsection of 110-page cross-examination. Those 30 pages, excerpts of the record, 229 to 259. And in the course of those 30 pages, the prosecutor is predominantly diving in and probing into what the defendant did and what the defendant said at the time of the search. And here, notably, what the defendant did not say is anything about this bag of fraud. So – But how – I don't understand how questions about all the years in all this time could possibly be about just the moment of the search. I mean, it seems like these are definitely improper questions. Again, and I think the cases Anderson and McAloota talk about parsing and about refusing to parse necessarily – So how can you parse? I mean, tell us how you interpret questions about how – the years that have passed as about the search. Well, it's in the context of an inquiry, a broader inquiry about the search. Yes, that does implicate a broader timeframe. I agree, Your Honor, it does. But I don't think that's where it stops. I think that the inquiry, again, in those cases, calls us to look broader to what the prosecutor was doing there. And here, I think it was probing in those 30 pages inconsistencies. But to the extent the Court finds that those were problematic questions, it goes to Your Honor's point before on harmlessness. And there, the three prongs are, first, what was the nature of the witness's comments? And here we have four. And those are on the – the defendant points those out, and it's – I believe it's a reply brief at page 37. There are four instances where he says, I didn't say anything because of counsel. So four instances in the course of a 110-page cross of a five-day trial. The government thinks that that's not in any – it's not an egregious amount of references here. The second prong is, was it ever argued to the jury in inference of guilt based on silence? Never, as Your Honor pointed out. It was never argued at closing, and it was never brought up again. The third prong is the weight of the evidence in the case against the defendant. And here, the great weight of the evidence is – shows that the defendant was, in fact, guilty. And here, there were physical evidence, the counterfeit cards in his trash that had his name on it. What about the juror, the jury note? Your Honor, I don't think that that's – you know, as far as the juror note and intent goes, fraud cases, as I'm sure the Court is aware, it always comes down to intent. I mean, the jurors always struggle with that prong, and I don't think that a jury note coming back asking what intent to act – what the intent – how do we determine – what evidence would we look at to determine intent on a future act? I think that the fact that a jury – Does it suggest that the case is not as open and shut a case as you're making it out to be? Well, there's nuance to it. But I think that, again, under a harmlessness error analysis, I think that the government – should the Court, again, find that certain questions were problematic, as I said, I don't think they are. Right, but I'm saying when you all bear the burden of convincing us beyond a reasonable doubt that the error was harmless, I mean, it just seems to me you pretty much do need to have an open and shut case. And doesn't the juror note suggest that there was not – it wasn't quite that clear-cut and that the jurors at least were – I don't know if struggling is the right word, but they had some questions about the only contested issue in the case. Well, and I think that ultimately they went back to the jurors – as they struggled, went back to the evidence in this case. And the evidence was strong, and the government contends, overwhelming on defendant's guilt. It was the physical evidence, the cards in the trash, and in addition to just the possessory evidence, we also had evidence that the defendant had Fry's receipts for the purchase of skimming software. I mean, well, he had Bluetooth software, which we heard about was used in these skimming schemes to pull the device data off of the skimmers. Bluetooth software, we had receipts from Fry's Electronics that defendant admitted to purchasing heat wrap, soldering irons, shrink wrap, soldering irons and heat guns, the materials to make a raw skimmer. The fact that the defendant went back, and the one item that he went back to retrieve in that bag, which allegedly was delivered the day before, that the government contends that's fabricated, the one item he went back for, a skimming device. We have $1,300 in cash. The defendant didn't have a job. We have a fraud – making fun of a fraud cartoon on his phone. It said, help fight fraud, donate your credit card. And then we have all of his statements. Not that hard to find if you know where to look. Counterfeit card-making equipment. Why am I being charged with one access device – or 15 access devices when I only had one? His statements. His admission that he was a known associate of A. Copp Candresian, and this person's the fraudster that defendant concedes was a fraudster. He's a known associate of that and had received counterfeit cards from him on one occasion before in his name. We have his statements that – and, again, it comes back to this story, this completely fabricated story which, in order to believe, you had to have believed that he spread all these fraudulent – happened to get them coincidentally the day before the search, spread them all around his house and into two cars. I see I have 40 minutes remaining, Your Honor. Not 40 minutes. I'm sorry, 40 seconds. 40 seconds, Your Honor. I apologize. And with that, I'm not sure if that gives me enough time to get into sentencing, so I will. Okay, very good. We appreciate the argument. Thank you. Let's give whatever time the defense counsel has for Ravello. Thank you, Your Honor. I want to just jump in with the Doyle error. And as they did in the brief, the prosecution focuses on the questions that were asked at the time of the search. Again, those are not at issue. It's what the government does in going forward to ask the six additional questions that it does. And the court in Anderson, which distinguished between a Doyle error and a permissible prior and consistent statement questioning, the distinction is were questions designed to draw meaning from silence. And here, there's no other conclusion to be made when the prosecutor is asking, isn't it true that you failed to come forward at any time prior to today? You've had multiple opportunities to do so in this years-long investigation. You failed to do so. The Supreme Court in the Brecht case found a clear Doyle error, and in doing so stated that the defendant there had made statements to law enforcement prior to Miranda and then sometime later was actually arrested for the offense. And there the court said, look, this sets up the principles in Doyle and Anderson v. Charles nicely because the prosecution was totally within its right to ask him about his failure to say anything when he met up with law enforcement the first time. But the prosecution crossed the Doyle line when it went further and asked about the silence after that point in time or more generally for his failure to come forward with his version of events at any time before trial. And that is indistinguishable from what happened in this case. That's temporarily after the Miranda warnings. But here, topically, topically, the government's arguing that his failure to say I was given the bag by somebody else conflicts with his prior statement that there's nothing either, no knowledge of any of the cards or the other materials. And that's fine. The government was well- Isn't that what the government is trying to impeach him on, is he has said something earlier that he didn't know about anything? And why, if you knew about this bag being given to you by a third party, didn't you tell us then? And why didn't you tell us then is appropriate. But the government crosses well over the Doyle line when it says, and in fact, you've never come forward before today and told law enforcement anything in this years long investigation. You've never come forward six different times. And then just to turn to the harmlessness, all of the evidence that was cited by the prosecution was contested by his testimony and the version of events that he gave. There was no issue, no dispute that he possessed these items or that he knew that he possessed these items. The only dispute was why he possessed these items. And this court in Foster and Caruto cited in the briefs state that a constitutional error that goes to the defendant's credibility is usually not harmless, where his theory of the defense of the case is plausible, even if not particularly compelling. Thank you very much. The case is submitted.
judges: Fisher, Watford, Friedland